## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **RUSSELL NATION, individually** | ) | |
| **and as parent and next friend of J.N.,** | ) | |
| **a minor and CAROL NATION,** | ) | |
| **individually and as parent and next** | ) | |
| **friend of J.N., a minor,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-18-1090-R** |
| | ) | |
| **PIEDMONT INDEPENDENT SCHOOL** | ) | |
| **DISTRICT NO. 22 and HOLLY** | ) | |
| **NOELLE MORRIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Before the Court is the Motion for Summary Judgment filed by Defendant Piedmont

Independent School District No. 22 (Doc. No. 78).  Plaintiffs responded in opposition to

the motion, Defendant filed a reply in support of its position and Plaintiffs were granted

leave to file a sur-reply.  (Doc. Nos. 81, 84, 99).  After consideration of the parties' written

submissions the Court ordered oral argument, requesting that the parties address particular

issues raised by the motions.  Having reviewed the parties' submissions and presentations,

the Court finds as follows.

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  The movant bears the burden of showing that no genuine issue of

material fact exists. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712–13 (10th Cir. 2014).  However, the party opposing a motion for summary judgment may not rely on "[t]he mere existence of a scintilla of evidence in support of [its position]; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986) (explaining that the opposing party must make a showing sufficient to establish the existence of those elements essential to that party's case).

Plaintiffs filed this action on behalf of themselves and their minor child, J.N., who is non-verbal and autistic, for injuries allegedly inflicted by Defendant Morris, who served as J.N's teacher at Piedmont Middle School.  Plaintiffs allege that J.N. was physically and verbally abused while at school by Ms. Morris.  Plaintiffs contend the school district is liable under 42 U.S.C. § 1983 for violation of J.N.'s constitutional rights, specifically his rights to due process.  Plaintiffs further contend that Defendant District was negligent and that it violated J.N.'s rights under the Oklahoma Constitution.

Defendant District asserts it is entitled to summary judgment on any failure to train or supervise claim, whether directed to the training/supervision of Defendant Morris or to other employees.  Defendant further contends that the Oklahoma Governmental Tort Claims Act did not waive sovereign immunity with regard to Plaintiff's negligence claims and that it is entitled to summary judgment on the state constitutional claims.

The Nations' basic complaint is that although the District had no written policy authorizing, condoning or encouraging inappropriate or unnecessary force by teachers against students, the District impliedly authorized, condoned and encouraged such behavior by failing to train and supervise its staff.  Plaintiffs argue Defendant failed to thoroughly train District employees, including Ms. Morris and the paraprofessionals who worked with her, as well as by failing to properly supervise Ms. Morris's work in the moderate to profound disability room from September 2017 through mid-January 2018. As a result of these failures, Defendant District is allegedly liable for the violation of J.N.'s constitutional rights.

Defendant District does not argue the absence of an underlying constitutional violation by Defendant Morris and accordingly, the Court assumes for purposes of the District's motion that at some point in time Ms. Morris violated J.N.'s constitutional rights. The Court finds, however, insufficient evidence in the record to establish liability on the part of the District.

Like a municipality, a school district may not be held liable under § 1983 solely because it employs a tortfeasor.  *Board of County Commissioners v. Brown*, 520 U.S. 397, 403 (1997); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978) (Section 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor.").  Rather, to hold a local government, such as the School District, liable under 42 U.S.C. § 1983, the plaintiff must allege that the "execution of a government's policy or custom […] inflict[ed] the injury …". *Monell*, 436 U.S. at 694; *see also Brown*, 520 U.S.

3

at 403-04 ("Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of […] those officials whose acts may fairly be said to be that of the municipality.")  In the Tenth Circuit, a municipal policy or custom may take many forms, including:

(1)  a formal regulation or policy statement;
(2)  an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;
(3)  the decisions of employees with final policymaking authority;
(4)  the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or
(5)  the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010) (internal quotation marks omitted).  Whether the basis of the claim is an officially promulgated policy or an unofficially adopted custom, the policy or custom must be the "moving force of the constitutional deprivation" before liability may attach.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985) (plurality opinion) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).  Accordingly, there must be some degree of "fault" on the part of the District in establishing or tolerating the custom or policy, but there must also exist a causal link between the custom or policy and the deprivation.  *Tuttle*, 471 U.S. at 823.

Here, Plaintiffs rely on the fifth example to establish a policy or custom – that is, a failure to adequately train or supervise employees.  A failure to train or supervise may

provide a basis for municipal liability so long as that failure results from deliberate indifference to the injuries that may be caused. *Bryson*, 627 F.3d at 788 (citing *Brammer-Hoelter*, 602 F.3d at 1189-90).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. City of Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1988) (internal quotation marks and citations omitted).[1]

Plaintiffs contend the District failed to adequately train Holly Morris on the proper treatment of students with disabilities and that it failed to train paraprofessionals on how to report the alleged abuse of students. Plaintiffs further contend Defendant failed to supervise Holly Morris, which permitted the abuse of J.N. to continue.

> "[A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Erickson v. City of Lakewood, Colo.*, 489 F. Supp. 3d 1192, 1207 (D. Colo. 2020) (alterations

---

[1] In its Order setting oral argument on Defendant's motion, the Court instructed Plaintiffs to be prepared to address in greater detail the narrow exception to the requirement of a pattern of unconstitutional behavior – the plainly obvious or highly predictable exception where the potential for constitutional violations is obvious. Counsel presented no additional argument to supplement the single sentence argument contained in their brief. The Court disagrees with the premise that "the consequences of its failure to train on reporting abuse and bullying is highly predictable and patently obvious: students like J.N. will continue to be subjected to the abuse and bullying." (Doc. 81, p. 22). The offending conduct, abuse of students, is the sort of behavior that is so obviously wrong that an ordinary person could recognize it as inappropriate. *See Kline v. Mansfield*, 255 F. App'x 624, 630 (3d Cir. 2007)(finding that "because not committing the crime of sexually abusing a child is obvious, the failure…to train… employees to spot signs of sexual abuse … was not deliberately indifferent.") Accordingly, the Court confines the remainder of its consideration of Plaintiff's claim to the general requirements for a failure to train or supervise claim.

omitted) (quoting *Connick v. Thompson*, 463 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)(plurality opinion) ("[A] 'policy' of 'inadequate training'" is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").

*Rustgi v. Reams*, No. 20-cv-0495-WJM-STV, 2021 WL 1698142, at *13 (D. Colo. Apr. 29, 2021). Under the "deliberate indifference" standard applicable to a failure to train or supervise claim, generally a plaintiff must present proof of "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62.[2] To satisfy this stringent standard, Plaintiffs must show that the District had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation" and "consciously or deliberately [chose] to disregard the risk of harm." *Barney*, 143 F.3d at 1307. And, as noted above, the failure to train or supervise must be the moving force behind the constitutional violation.

The issues of notice and causation both rely on the timing of events. Unfortunately, the timeline of events in this case is murky.[3] Ms. Morris served as J.N.'s teacher for the 2016-17 school year, apparently without incident. The 2017 school year started without

---

[2] Failure to supervise and failure to train are treated the same in the Tenth Circuit. *Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006).

[3] Because J.N. is non-verbal, he is unable to describe for the Court the alleged abuse he suffered or when he suffered such abuse. It is not disputed that the issue of the treatment of students by Holly Morris became public on January 16, 2018, when students and staff witnessed Ms. Morris drag D.O., another severely disabled student in her class, to the bus. Investigation into that incident led to a number of staff members raising concerns about her interactions with students. Most of the statements given by staff members do not include dates and in some cases do not identify the student at issue. The bus incident involving D.O. came on the heels of an incident with a student, J.M., when Ms. Morris allegedly failed to follow procedures to be used in the event of a "raging" student. (Doc. No. 78-18, p. 1). The District suspended Ms. Morris on January 17, 2018, citing the incident wherein she dragged the student to the bus. (Doc. No. 78-18, p. 3). She never returned to teach, resigning in February. (Doc. No. 78-22). She entered a no contest plea to two misdemeanor counts of causing a child to be deprived in violation of Okla. Stat. tit. 21 § 858.1 related to her treatment of two students, D.O. and J.N. (Doc. No. 78-24). The State's offer of proof was that Ms. Morris engaged "in a pattern of physical contact which was not consistent with her role as their teacher." *Id.*

incident.  However, on September 15, 2017, Russ and Carol Nation met with Ms. Morris

regarding bruises on J.N's collarbone and shoulder.[4]  On Monday, September 18, 2017,

Holly Morris sent an email to Principal McDonald, Nadia DeKoch, the vice principal, and

Courtney Lockridge, executive director of educational services for the District.  Ms. Morris

wrote:

> I wanted to let you know that Carol and Russ came up here last Friday.  J had
> a bruise that they were concerned about.  I usually inform them of any type
> of scratches or bruises that he has incurred during the day either by biting,
> scratching or hitting himself.  This particular bruise I did not have an answer
> for.  I did tell them that J is much more aggressive this year and due to that
> we are having to be more physical with CPI related techniques to keep
> everyone safe.  They were not upset, but they wanted to talk about ways to
> help him be less aggressive at school.

(Doc. No. 78-15, p. 1).[5]  She thereafter recounted that it had already been a difficult

morning with J.N., stating that he had become aggressive and pulled her hair from behind

and grabbed her neck.

Carol Nation testified about a second meeting with Defendant Morris sometime in

October 2017 (Doc. No. 78-6, p. 13).  "We were trying to find out why J was continuing

to have laceration – he had a cut, scratch on his head.  And trying to find out why things –

why he was so much more aggressive that year than he ever had been."  *Id.* p. 14.  Carol

Nation recalls that Ms. Morris expressed that she was feeling attacked and that she offered

the explanation that the scratch was a result of J.N. slipping in the bathroom.  *Id.*  The

follow-up to that meeting was an email from Carol Nation to Clay McDonald on October

---

[4] It is unclear from the evidence whether Principal Clay McDonald also attended that meeting.

[5] CPI is a de-escalation program with a goal of avoiding placing hands on a student to control the student's behavior.

7

12, 2017, wherein she indicated that it might help J.N.'s outbursts if he spent time outside. *Id.* at 15.  Mr. McDonald responded the next day, and for reasons unclear from the record, shortly thereafter, Stephanie Kunnarz, a special education teacher, informed Mr. McDonald that she and Keith Ooten, also a teacher, would be happy to take J.N. out for walks during the day. (Doc. No. 78-16).  Mrs. Nation did not recall any other bumps, scratches, or bruises on J.N. from school after that meeting.[6]

Tanya Caraballo, a paraprofessional assigned to Defendant Morris's classroom specifically to work with J.N., offers the most informative testimony about conditions in the Morris classroom and efforts to report the teacher's behavior toward the students.

> Q:  And how often did you report things to [Clay McDonald]?
> A:  Twice for sure, that – the first time was kind of vague, like we're kind of needing some help down there, and then the second time was very, I mean, very vivid, like I gave him details and what exactly was going on.

Doc No. 81-1, p. 8.[7]  According to Ms. Caraballo, after the first report Clay McDonald indicated he would speak to Morris.  Although Ms. Caraballo did not hear anything more

---

[6] Carol Nation was asked in deposition about the allegations in the Amended Complaint, specifically paragraph 4 thereof.

> Q:  So when we talk about – when you talk about here in paragraph 4 about verbal and physical abuse and batter [sic] and assault, are those the only two instances you're talking about?
> A:  While we only had the two meetings with Clay and Holly that I can recall, I do remember even other students telling me that they could hear Ms. Morris outside the classroom yelling and using profanity with students.

Doc No. 78-6 at p. 21.  During the police investigation Carol Nation told officers that she had been concerned because she had seen bruises on her son's neck and face, and that she had spoken to McDonald and Morris but did not believe Morris was telling the truth.  (Doc. No. 78-21, p. 15).  From the Court's perspective, the two statements are consistent only if the bruises referenced by Carol Nation to the police were those about which she complained in September and October 2017.

[7] The second more-detailed conversation was the result of a conversation between Tanya Caraballo and Lynda White, director of special services for the District.  Caraballo testified that she called Lynda White to ask about protocols for raising her concerns, after informing Ms. White about her initial vague statements to Mr. McDonald.  Ms. White advised Ms. Caraballo to reach out to Clay McDonald again and to give him specifics and examples of what had occurred.

from McDonald, shortly after their first conversation Ms. Morris allegedly informed the members of her team that they could find other jobs if they did not like how she was doing things.  (Doc. No. 81-1, p. 9).  Ms. Caraballo recalls that the second conversation with Mr. McDonald – wherein she allegedly revealed details about what was occurring in Morris's classroom – occurred within a month of the first conversation, that is, sometime in either late September or early October 2017.[8]  *Id.*  Ms. Caraballo's deposition provides some information regarding the timing of disclosures to the District with regard to certain allegations.  However, not all of the evidence is clear regarding timing or who was the alleged victim of any particular incident.[9]

---

[8] Ms. Caraballo was asked in her deposition if she knew whether others had reported classroom incidents during the first semester.  Although Dana Roberts, a paraprofessional who worked in the classroom at the beginning of the 2017-18 school year, and Keith Ooten, a special education teacher, told her they had made reports, she did not know whether they actually had.  Keith Ooten told Mr. McDonald on January 17, 2018, that "he has not witnessed anything inappropriate from Mrs. Morris, he was just here to report what the paraprofessional in the room and a paraprofessional substitute, Jennifer Rollins, had reported to him."  (Doc. No. 78-18, p. 2).  As a result, any testimony he might offer as to what transpired would be inadmissible hearsay.

In his deposition, Mr. McDonald testified that during the fall of 2017 he never observed Ms. Morris not following policies or procedures and that he had no complaints by any paraprofessionals.  (Doc. No. 78-3, p. 22).  He later testified that he had received comments from teachers who had helped in the classroom that it was an intense room, but that he was never told of specific incidences.  (Doc. No. 78-3, p. 39).  He testified about efforts made to reduce the intensity, specifically adding a paraprofessional and bringing in a behavior specialist for one particular student, not J.N.  *Id.* at pp. 40-41.  He acknowledged that Tanya Caraballo "spoke to [him[ about some incidences that she was frustrated with in the classroom, and so I addressed it with Ms. Morris …".  *Id.* at p. 45.  He recalled "talking with her about just the intensity of the room … It seems most of it really had to do with student D.O."  *Id.  See also* Doc No. 81-2, pp. 11-12.  He testified that Mr. Ooten, who subbed for Ms. Morris, passed along concerns he had heard from paraprofessionals.

[9] As to certain of the allegations, the Court finds no basis for concluding that Holly Morris engaged in the behavior with J.N.  For example, Ms. Caraballo testified that Ms. Morris used pressure points on a student.  [Doc. No. 101-1, p. 1).  She also testified that she did not witness Ms. Morris use pressure points on J.N.  (Doc. No. 78-7, pp. 11-12).  There is no testimony that anyone ever witnessed Ms. Morris using pressure points on J.N.  It is necessary to distinguish between allegations related to J.N. and those related to other students, because evidence of abuse of any student and whether and when such information was conveyed to the District is relevant to the issue of whether the District was deliberately indifferent to the need for additional training and supervision.  However, only injuries to J.N. are relevant to whether his constitutional rights were violated as a result of the alleged deliberate indifference by the District.

Construing the evidence in the light most favorable to Plaintiffs the Court finds no basis for holding the District liable for the alleged violation of J.N.'s constitutional rights. As noted above, to impose municipal liability for a failure to train and supervise, generally the District must be put on notice, actual or constructive, that its action or failure to act is substantially certain to result in a constitutional violation. In response to Defendant's motion for summary judgment, Plaintiffs argue that notice is undisputed, citing three events that occurred in September 2017: (1) a September 15, 2017 meeting between Holly Morris and the Nations wherein they asked about two bruises on J.N.; (2) an admittedly vague statement by Tanya Caraballo to Principal McDonald; and (3) a complaint by defendant Morris during that same time period that her classroom was chaotic. The Court finds based on the evidence that the allegations in these three communications were not sufficiently specific to give notice to the District that failing to train or supervise would be deliberately indifferent.

The Court finds, however, that Ms. Caraballo's statement to Mr. McDonald in either late September or early October was sufficient to put the District on notice.[10] According to her deposition, in her second conversation with the principal Tanya Caraballo informed him that she and Holly Morris had taken J.N. to the bathroom – this was during the timeframe the school was working on potty training. J.N. kept trying to stand up and, according to Tanya Caraballo, Holly Morris eventually grabbed his hair and slammed his

---

[10] Having concluded that the evidence construed in the light most favorable to Plaintiff establishes notice no sooner than late September/early October, when Tanya Caraballo had her second conversation with Mr. McDonald, the District cannot be held liable for any alleged constitutional violation by Ms. Morris prior to that date.

head against the wall. (Doc. No. 81-1, pp. 18-19). She further testified that during that same meeting she informed Principal McDonald that Holly Morris had flipped a desk on which J.N. was kneeling, causing him to fall, and similarly she knocked a trampoline out from under him.[11] (Doc. No. 81-1, p. 21). Finally, Ms. Caraballo testified that during the conversation she informed Mr. McDonald that Defendant Morris made comments in reference to J.N. that he would never do anything in life and that his parents were stupid and uneducated. (Doc. No. 81-1, pp. 21-22). Clay McDonald allegedly responded, "that doesn't sound like her, but I'll talk to her." (Doc. No. 81-1, p. 19). The Court finds the evidence sufficient to establish a pattern of unconstitutional behavior by Ms. Morris for purposes of municipal liability. The next issue is whether the District's failure to either increase training or supervision after this date was the driving force behind subsequent constitutional violations. The Court finds an absence of admissible evidence from which a jury could find that J.N.'s constitutional rights were violated after the District received notice of alleged abuse, premised largely on the murky timeline of events.[12]

The Court requested that Plaintiffs address the issue of timing of instances of alleged abuse at the hearing. (Doc. No. 100 at p. 3) ("Plaintiffs should be prepared to identify what events were contained in Ms. Caraballo's second statement to Mr. McDonald and to

---

[11] . The deposition testimony of Tanya Caraballo submitted by the parties does not describe this particular incident. However, in a January 18, 2018 email to Lisa Campbell, Ms. Caraballo indicated that a child was sitting on his knees on the trampoline when Holly Morris pulled it out from under him, which allowed him to slam to the ground. The submitted testimony indicates this event was reported to Mr. McDonald.

[12] Only admissible evidence may be considered when ruling on a motion for summary judgment. *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion). Any documentary evidence submitted in support of summary judgment must either be properly authenticated or self-authenticating under the Federal Rules of Evidence. *Goguen v. Textron, Inc.*, 234 F.R.D. 13, 16 (D. Mass. 2006). However, even if all the evidence were deemed admissible, it is still insufficient to establish a timeline of events.

identify any alleged violation of J.N.'s constitutional rights that occurred after her second complaint.")  Counsel argued that the January 2018 statements by employees given in response to the January 16, 2018 bus incident involving D.O. indicate that Holly Morris violated J.N.'s constitutional rights after the District received notice of her first semester transgressions.

The majority of the statements addressing J.N. specifically reference Ms. Morris's failure to adhere to the school's bathroom protocol.[13]  For example, although teacher Keith Ooten admitted he had not witnessed any inappropriate behavior by Defendant Morris, his statement contains information allegedly conveyed to him by Jennifer Rollins, a paraprofessional who substituted for Tanya Caraballo, indicating that sometime the previous week, J.N. was very upset and was acting inappropriately.[14]  Ms. Morris decided to take him to the restroom although it was not time for him to go.  Ms. Morris allegedly told Ms. Rollins to stay in the classroom, that she would be taking him alone to the restroom, and when they returned J.N. looked distraught.  Mr. Ooten's statement, however, was not based on personal knowledge.  (Doc. No. 78-20, p. 7).  The only direct statement

---

[13] On October 19, 2017, Mr. McDonald had Ms. Morris sign a sheet entitled "Expectations for paraprofessionals at Piedmont Middle School."  (Doc. No. 78-17). As it relates to J.N., the document indicates that "[t]wo staff members must be with J. when he is taken to the restroom."  *Id.*  The record contains no evidence of the catalyst for the document or the meeting that Mr. McDonald conducted individually with the staff members when they signed the document.

[14] Tanya Caraballo testified about other incidents, but there is no evidence about the timing thereof, and she indicated she never told anyone about them.  Specifically, she indicated that: (1) once J.N. had Ms. Morris by the hair and instead of using CPI techniques she turned around and gave J.N. "a little right hook."  (Doc. No. 81-1, p. 6); (2) Holly Morris allegedly punched J.N. in the genitals to stop him from masturbating.  (Doc. No. 78-7, pp. 12-13); and (3) J.N. returned from the bathroom, having been alone with Ms. Morris, who told another paraprofessional to put ice on his face.  (Doc. No. 81-1, p. 6)  At the hearing, counsel argued that, because Tanya Caraballo did not testify that she informed Mr. McDonald about these instances during her late September/early October meeting, it can be inferred these events occurred after that time.  There is no basis in the record to infer the timing of events based on the failure to provide testimony from Ms. Caraballo that she either informed Mr. McDonald of all instances that had occurred when she made her second complaint or testimony that these events occurred after her complaint.

given by Jennifer Rollins addressed a situation involving D.O. (Doc. No. 78-20, p. 1). Many of the statements do not reference specific children or offer sufficient identifying information, and most do not indicate any timeframe.[15]

The best evidence Plaintiff presents regarding the timing of alleged aggression directed at J.N. is the statement by Christian Resz to school officials after the January 16, 2018 bus incident, stating "[i]n the last few weeks, Holly became increasingly aggressive with J and D." (Doc. No. 78-20, p. 13). This statement, however, is too vague to permit the Court to discern that Defendant Morris violated J.N.'s constitutional rights and that the absence of training or supervision after late September 2017 was the moving force behind the violation.[16]

In summary, there is insufficient evidence that Ms. Morris violated J.N.'s constitutional rights after the District was provided notice in late September or early October 2017. Therefore, Defendant District cannot be held liable under 42 U.S.C. § 1983 and the motion for summary judgment is granted in this regard.

---

[15] Similarly, the speech therapist informed McDonald that Morris's classroom had been very volatile lately and she was concerned for student safety. "She stated she had seen Mrs. Morris getting her hair pulled and clothes ripped previously but Mrs. Morris would respond by grabbing and choking the students to get them calm down. She stated this had only happen (sic) in the last few days." (Doc. No. 78-18, p. 2). On January 17, 2018, Ms. Kunnanz's statement to McDonald, mostly involved D.O., but stated "I have witnessed Holly speaking very harshly to the kids, slapping J. hands and pushing J. against the wall in the past." (Doc. No. 78-20, p. 2).

[16] Christian Resz stated, "I saw her grab J['s] chin because 'it was how to reset him, so that he could refocus.' Often times, especially during speech, she would 'restrain' him, holding both arms behind him, so that he would work. I also saw him yank his hair to get him to work on occasion." (Doc. No. 78-20, p. 13). Christian Resz also indicated that Holly Morris had violated the bathroom protocol, taking J.N. to the bathroom alone more frequently in the last couple of weeks. *Id.*

Defendant District also seeks summary judgment on Plaintiffs' negligent investigation claim, asserting that pursuant to the Oklahoma Governmental Tort Claims Act ("OGTCA"), it is entitled to sovereign immunity. Plaintiffs disagree.

The OGTCA is usually the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort. *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1163 (Okla. 2009). In the Act, the Oklahoma legislature adopted the doctrine of sovereign immunity, but proceeded to waive that immunity such that the state or a political subdivision is "liable for loss resulting from its torts or the torts of its employees acting within the scope of their employment … where the state or political subdivision, if a private person or entity, would be liable for money damages under [Oklahoma law]." Okla. Stat. tit. 51, §§ 152-153. Section 155 of the Act sets forth certain exemptions. The exemption upon which Defendant District relies provides, "a political subdivision shall not be liable if a loss or claim results from … [p]erformance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees." Okla. Stat. tit. 51, § 155(5).

The Court need not delve into whether investigation into allegations of abuse of a student, nor deficiency in its investigation, is a discretionary function under § 155(5) for the same reasons Plaintiff J.N. cannot prevail on his § 1983 claim. The admissible evidence is simply insufficient to show that any negligent investigation caused subsequent injury to J.N. The District is entitled to summary judgment on this claim.

In its Reply brief, Defendant addresses the issue of its liability under a theory of *respondeat superior*, that is, whether the District can be held liable for the tortious actions

of Holly Morris.  The District argues that a theory of assault and battery by Holly Morris is inconsistent with liability under the GTCA because the statutory definition of "scope of employment" mandates that an employee be acting "in good faith within the duties of his office or employment." (Doc. No. 87, p. 8) (citing Okla. Stat. tit. 51, § 152(9)).[17]  In a sur-reply, Plaintiff argues that the issue of scope of employment is one for the jury.

In the context of certain torts, it is impossible for an employee to have committed the alleged tort and still have acted in good faith.  *See, e.g., Parker v. City of Midwest City*, 850 P.2d 1065, 1068 (Okla. 1993) (malicious prosecution); *McMullen v. City of Del City*, 920 P.2d 528, 530-31 (Okla. 1996) (tort of outrage).  However, "[u]nder some circumstances, assaults committed by government employees may be found to be within the scope of employment."  *Spradlin v. City of Owasso*, No. 12-cv-497-JED-FHM, 2014 WL 1664974, *9 (N.D. Okla. Apr. 25, 2014).

> Under Oklahoma law, when "the tort cause of action sued upon requires proof of an element that necessarily exclude good faith conduct on the part of governmental employees, there can be no liability against the governmental entity in a [O]GTCA-based suit." *Fehring v. State Insurance Fund*, 19 P.3d 276, 283 (Okla. 2001), *overruled in part by Gowens v. Barstow*, 364 P.3d 644, 652 (Okla. 2015).

> The Board correctly states the general rule that an assault on a third person is not within the scope of an employee's authority. See *Rodebush v. Oklahoma Nursing Homes, Ltd*., 867 P.2d 1241, 1245 (Okla. 1993). However, the Board fails to note the well-established exception to this rule: intentional torts may be committed within the scope of employment, when such acts are "incidental to and done in furtherance of the business of the employer even though the servant or agent acted in excess of the authority or willfully or maliciously committed the wrongs." *Baker v. Saint Francis Hospital*, 126 P.3d 602, 605 (Okla. 2005) (citations omitted). "This is not to

---

[17] Though the District cites Okla. Stat. tit. 51, § 152(9), the quoted provision in its brief is derived from Okla. Stat. tit. 51, § 152(12).

say that the commission of the tort was within the scope of the employee's authority, for no authority for such commission could be conferred, but where the employee was acting within the scope of authority to do the particular thing rightfully that was subsequently done in a wrongful manner." Id. (citations omitted). See *Perry v. City of Norman*, 341 P.3d 689, 691 (Okla. 2014) (finding "employer liability extends when an employee's conduct is an assault of excessive force if the conduct also occurs within one's scope of employment."); *id.* at 691-93 nn.7-12 &14 (citing cases in which claims proceeded under the OGTCA based on assaults of excessive force).

*Guthrie v. Gragg*, No. 15-cv-162-JHP, 2016 WL 3746566, *8 (E.D. Okla. July 8, 2016)(footnote omitted). "For purposes of determining a state's or political subdivision's liability for its employees' acts under 51 O.S. § 153, a finding that an officer at some time during the episode … went beyond the bounds of good faith is not necessarily inconsistent with a finding that the officer acted within the scope of his employment." *Lampkin v. Little*, 286 F.3d 1206, 1213 (10th Cir. 2002)(internal quotation marks and citation omitted). "The question of whether an employee has acted within the scope of employment at any given time is normally a question for the jury …." *Nail v. City of Henryetta*, 911 P.2d 914 (Okla. 1986).

In light of the testimony of Clay McDonald and Holly Morris, a jury could find that Ms. Morris's behavior toward J.N. subjects the District to liability under the GTCA because of her inappropriate classroom and behavior management. Therefore, the District is not entitled to summary judgment on this negligence claim.[18]

---

[18] Defendant does not address immunity under Okla. Stat tit. 51, § 155(35), for "[t]he use of necessary and reasonable force by a school district employee to control and discipline a student during the time the student is in attendance," and accordingly, the Court declines to address this limitation on District liability.

16

Defendant seeks summary judgment on Plaintiffs' claims under the Oklahoma Constitution.  Plaintiffs "concede that, for purposes of this case, the Oklahoma Constitution does not grant greater liberties and protections than the United States Constitution and therefore their claims under Oklahoma's Constitution should not proceed to trial."  (Doc. No. 81, p. 32, n. 3). Accordingly, Defendant District is entitled to summary judgment on Plaintiffs' state constitutional claims.

Finally, Defendant seeks a ruling on the applicability of the damages cap set forth in §152(5) of the OGTCA.  Specifically, the District contends that any claim for damages by Carol or Russell Nation should be aggregated into J.N.'s claims and the total capped at $125,000.00.  Plaintiffs concede the cap applies, but assert the Court should not address the issue at the summary judgment stage, but should wait to see whether the jury awards damages in excess of the cap and adjust the damages accordingly.  Plaintiffs Carol and Russell Nation contend they have individual claims against the District for its negligent investigation and are separate claimants under the OGTCA.  (Doc. No. 81, p. 31).  The Court, having granted summary judgment to the Defendant on the negligent investigation claim, need not address the cap at this juncture.

Defendant District's Motion for Summary Judgment is granted as to Plaintiffs' 42 U.S.C. § 1983 claim and as to the negligent investigation claim.  The motion is denied as to the *respondeat superior* claim premised on Ms. Morris's actions and granted as to the claims under the state constitution. The Court declines to address the statutory damage cap at this juncture beyond the discussion above.

**IT IS SO ORDERED** this 23rd day of July, 2021.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE